Thank you and good morning. May it please the Court, David Ducro for the appellant Kevin Glass. And unless the Court wants me to address specific questions initially, there are three areas that I do want to address. The issue of the disability, the issue of the stray remarks and the retaliation, and the issue of sanctions. The District Court dismissed all of Plaintiff's disability-related claims by finding that he was not disabled. And I think it's fair to say that the undisputed facts in the motion for summary judgment were that Mr. Glass had a disability, which limited his ability to work, as exemplified by the lease of absence. He had a record of impairment. Intel's own records show that. And he was perceived as disabled. Nonetheless, the District Court said that there was no evidence of that disability. First, the evidence from the undisputed facts is that he was not disabled. The Court said was that even if there was that, there was no evidence of adverse employment actions. Well, I believe what the Court – I thought the Court did say that he was not disabled. But in addition, there were adverse employment actions. Primarily, he was not granted the final leave which he asked for. He was not given another job after he had identified several positions that he could transfer to. So there was this adverse action as well. Well, all I was doing is looking at the ADA claim and what it is that I thought the District Court said. And so I was just trying to make sure you addressed what I thought the District Court said on the ADA claim. Yes. Intel grants medical leaves of absence for disabilities. Mr. Glass did not receive the third medical leave of absence for a different type of disability that he had had. He definitely meets the ADA test, though, for being disabled. On the issue of the adverse employment actions, he received negative evaluation after negative evaluation, although he also received some positive evaluations, and that's detailed more in Mr. Glass's declaration, which is part of the record. Are you really then arguing the – is your argument go to the evidence presented? I mean, I got past the evidence presented. I'm even saying even if, and then I'm trying to go to the further stuff that needed to be presented, because as I understand, the District Court said that there wasn't any admissible evidence of ADA-qualifying disability because there were only hearsay statements from the doctor unsupported by affidavit or declaration. Well, I think that's what I interpreted as the Court saying that there was no evidence of the disability. Now, that evidence did come in. It was attached to Intel's motion, the Maria Nasta Declaration, and she attached numerous documents, Intel documents, that she attested she sent to Dr. Link and he filled out and sent back, and that these are the documents that she received back, and all throughout those documents it says Mr. Glass is disabled, Mr. Glass has this disability, and she – and Dr. Link would describe the functional limitations that were caused by that disability. So the evidence, A, was there, and B, was admissible. It wasn't objected to. What is – excuse me, could you run through that again? The evidence is – I had the same impression that Judge Smith has, that the judge said the evidence was not admissible because there was no affidavit from the doctor or any – anything other than notes from the doctor, and therefore it was not admissible evidence. Is that incorrect? It's correct that that's what the Court said. It's correct that there was no declaration from Dr. Link, but the admissibility comes because Intel itself submitted that evidence with a declaration from its human resource person who is handling this claim, saying these – these are the questions I asked Dr. Link, this is his handwriting, and these are the forms I got back from him. And if you look at the forms they got back from him, it says over and over that Mr. Glass was disabled. Well, and I was just trying to avoid this argument that we have here, and then jump to the second part, I guess, because my view is that there wasn't any evidence that any of the individuals responsible for the adverse employment action were aware of the disability. And further, that Intel provided, in my book, a legitimate non-discriminatory rationale for the termination, and therefore, there was no evidence thereafter that that was pretextual. I mean, even given the disability. That's the way I understood the district court. There – there was this e-mail between two of the supervisors, the one that had supervised Mr. Glass before he left on his second leave and the one who was his incoming supervisor. I don't have the pinpoint record citation for it, but in it, the first one says that Mr. – had Mr. Glass not been on medical leave of absence, you know, this evaluation would have occurred. And then there is other communications with HR specifically referring to the medical leave of absence. So they knew that he had been disabled. He also talked about it. I mean, he – they knew that he was gone for a year. Well, but, okay, let's not even argue about that. Hit the second issue. If, in fact, he showed what he had to show for a prima facie case, what evidence is there in there that any of the actions taken by him were taken by individuals aware of that? Well, there are – What evidence do we have in this record to suggest that? Just give me one. I couldn't find it. I'm like the district court. I tried to. Okay, I'm not sure what you're asking me here. Well, you're – you base all your stuff on he was disabled, so therefore it is. But really, the termination occurred by somebody. And the termination occurred by people who didn't know about it, even though it was – even though we could allege it is. They didn't know about it. They say they did it for a totally different reason, which I found to be legitimate, nondiscriminatory. And then you, under the McDonnell-Douglas doctrine, have to come back and show its pretext. And I couldn't find the evidence of pretext. Well, the evidence of pretext is from Mr. Glass's declaration, where he attaches the evaluations he had received, the communications he had received, talking about what a good job he was doing, talking about, you know, how he had come through on different tasks that he was given, that he was doing a good job. And I think for a summary judgment purpose, that is enough to raise at least an inference that this was pretext. This is not the usual, you know, you're fired type of termination. This is Mr. Glass being out on disability, asking to come back, asking for a little extra time on his disability. His work group is disbanded. He wants to come back into some other position. He's never told, you're fired. He's just told, well, you – we can't give you that job. We can't give you that job. He identifies position after position. And he's just never – he's never told why. He's never interviewed. He just keeps being told no. So it's not like somebody made a decision to fire him. They talk about what, you know, bad performance he had, but I think Mr. Glass's own declaration and the exhibits show that there are at least two sides to that story, which for purposes of summary judgment should go to a jury. But there's also this, what's been called a stray remark, which perhaps the retaliation claim is better than the discrimination claim, but what's been deemed a stray remark was when Mr. Glass's manager tells him, drop the EEOC claims or suffer the consequences. Now, who's that that said that? Oh, I believe it was Mr. Nick Jew. I don't think so. I do remember the name. I would recognize the name. I don't know that I made a note of it, but I think it was the – Was it Mr. Tallow? It could have been Mr. Tallow. I was going to say it was Mr. Tallow. Okay. I'm surprised you didn't know it was Mr. Tallow, but it was Mr. Tallow. So in that particular situation, even if Mr. Tallow were the person, again, I didn't find any evidence that Mr. Tallow had any part in deciding to cancel a project. I didn't find any evidence that Mr. Tallow had any part of eliminating Mr. Glass's job. And so, therefore, I guess I'm trying to figure out, I also found in the record that Intel informed Mr. Glass that his position had been eliminated in November of 2006, long before the meeting with Mr. Tallow. So I guess I'm, again, I'm trying to find – you can say all you want about a stray remark, but how does it affect the decision as made? Well, the decision-making process isn't – again, it's not made by one person. It's made by discussions among the managers and among his peers, and that's how these evaluations come out, is they rank and rate each other relative to each other, and someone who's out on a disability leave gets ranked and rated right alongside those who are working there. So, you know, I can't say Mr. Tallow went to Mr. Glass and fired him or that he eliminated his job, nor can you say he had even anything to do with canceling the project or the decision to eliminate. The best you could say, he was supposed to say what had to be said, and he didn't because he was out on family emergency. But what evidence do I have that he was at all interested or involved in canceling the project or in deciding to eliminate the job? Well, I can't say that he was. So, therefore, we're done. Well, he, you know, he's speaking for Intel when he says that, though. He is a manager. He's a management-level employee. And if he's saying that, then, you know, that statement can be attributed to Intel as an entity. I hear your argument. Okay. Well, it also shows – I think it shows more of the corporate culture of Intel as well, where they weren't interested in accommodating Mr. Glass, certainly nothing that they did indicated an intent to accommodate him after he wanted to come back from his leave and he wanted to, you know, he found other positions, he was looking for another position, and nothing ever became of it. If I could briefly address the sanctions issue, and I'll acknowledge that I am the counsel who was sanctioned in this case, there are both procedural and substantive issues that I wanted to point out with the sanctions. On the procedure, the initial motion did not ask for sanctions against counsel. They weren't seeking sanctions against me. It was only the district court which imposed them through the order, and the order was issued before my opposition was even due. So the court didn't even consider my opposition before that. The court then vacated that order following my motion to vacate, but then issued the same order later, even quoting its earlier verbiage about how my time to respond had come and gone and I hadn't responded, which is absolutely incorrect. What is my standard of review on that particular issue? It depends under which of the – which authority the court imposed the sanctions. For most of the – Kennedy, you think it was the authority for imposing the sanctions was under? Well, the court cited Title VII. It cited ADA, ADEA, and ADEA. And I guess I'm, again, saying to you, it seems to me that the best I can do in these kind of circumstances is suggest that this is an abuse of discretion review. Well, it's a de novo review, at least for the facts underlying it. And in my brief, I separated apart for the statutes, which are de novo, and there was one that was abuse of discretion, which I believe was 1927. Did the court rely on the fact that you submitted the answer late? Was that part of its basis? I didn't answer late. I know you didn't. I said, did the court base its determination in part on the fact that you – that it believed you answered late? It says so in the final order, so I have to conclude that. And it is – that's not a question of judgment. That's a question of fact, whether you did or didn't answer late. Correct. So that if it's wrong on that, and it's part of its judgment, that would be an error that, whether it was sufficient or not, that it would not be an abuse of discretion. It would be an error of law, which always constitutes an abuse of discretion. All right. Thank you. It's – you have only ten seconds left, if you – Unless you have other questions, I'll – Thank you. May it please the Court. My name is John Frye, and I represent the Appellee Intel Corporation in this matter, as does my colleague, Andrea Lisenby. I'd like to begin by answering a question that I don't believe appellants counsel answered in response to a query from Judge Smith as to what evidence is there in the record that Mr. Glass's supervisors, before he went out on his third year-long medical leave of absence, which, contrary to that representation, he did receive a third year-long medical leave of absence. What evidence is there that any of those individuals had any input into the ultimate employment decisions at issue in this case, that being Mr. Glass's termination after his project was canceled and he didn't have a job to come back to? And the answer, Judge Smith, is there is no evidence in the record that any of those individuals had any input. And, in fact, that's – it's uncontroverted in the record if – if – Is this a document Mr. Tallow has had? I'm sorry? Mr. Tallow? Mr. Tallow is the – is the individual that Mr. Glass – And he was supposed to advise plaintiff that he was terminated, but then he had a personal problem, so somebody else did it? He was supposed to be there to deliver the news that Mr. Glass no longer had a job at Intel, but his declaration is uncontroverted, as is Ms. Nasta's, that Mr. Glass – or, I'm sorry, Mr. Tallow had no input whatsoever into the decision to deny the job protection during that third year of leave. That, you know, would have allowed Mr. Glass some time to find a new job. It's also undisputed in the record that Mr. Glass never applied for another job with Intel or sought another position during the time frame at issue in this lawsuit. He went out on his third-year-long medical leave in February of 2006. And when he wanted to come back, that crew had been eliminated, the job, the project. Why did he come back? No, no. I said when he wanted to come back, the project had been eliminated. That's correct. And even at that point, the project was eliminated in September of 2006. Mr. Glass was informed of that fact. He continued on his medical leave of absence, for which he was receiving short-term disability, until February of 2007. So he took advantage of the full year. At that point, when he attempted to return, he was informed, you no longer have a job because the project was canceled and you didn't have job protection when that occurred. Mr. Glass admits, in response to Intel's motion for summary judgment and its statement of facts, that he was treated exactly the same as any other similarly situated employee who is out on medical leave beyond the period of job protection at the time their project is canceled. And did none of those people get any other jobs? Some of the other folks that were in that group did get other jobs. But that's because they applied for them. They had to go out and look for and find those jobs. Mr. Glass never applied for another job with Intel during the time frame at issue here. Now, he attempts to come back in February of 2007. He then starts applying for some jobs. He waits eight more weeks before he starts applying. But that alleged failure to rehire isn't at issue in this case because it's the subject of yet an eighth charge of discrimination that hadn't been resolved by the agency at the time of this case, at the time this complaint was filed. And the EEOC, just for the record, found no cause for discrimination on those claims either, as was the case with his first seven charges of discrimination. That's not unusual. What about the question, which I think the district court relied on, there was no evidence of the violation of the ADA, no evidence from the doctor that it was admissible. The opponent says there was evidence that was introduced in the form of an admission by Intel. Do you agree or disagree with that? That assertion is incorrect, Your Honor. There are two time frames at issue in this lawsuit. The first time frame is when Mr. Glass was actually working at Intel from November of 2005 until he went out on the third medical leave in February of 2006. During that time period, there is not one shred of evidence in support of an ADA-qualifying disability. These medical records that Appellant's counsel refers to were all part of the records that Intel introduced as part of Ms. Nasta's declaration, who works in the Occupational Health Department, not the Human Resources Department, to demonstrate the interactive process she attempted to engage in with both Mr. Glass and his psychiatrist, Dr. Link, in response to which it's uncontroverted in the record that they're the ones that disregarded her. They, Dr. Link and Mr. Glass were the ones that disregarded her. But does the, all I ask is does the affidavit from Ms. Nasta or whoever it is, contain admissible evidence from Dr. Link that he was disabled? No. It contains documents that were submitted by Dr. Link in purported support of a disability. Ms. Nasta concluded that because of the cursory nature of those forms, that he hadn't established any sort of substantial limitation on any major life activity. He would submit forms that would just include words like depression impacts, working, thinking, and getting along with others. She repeatedly reached out to Mr. or to Dr. Link and asked him, please provide me more information. So you're just asking whether Dr. Link's statements or reports or whatever they are are admissible as a result of the fact that they were attached to Ms. Nasta's affidavit? The answer to that is yes, Your Honor. Now, none of those records pertain to the time frame before Mr. Glass went out on this third year-long medical leave of absence. And for that period of time, there's no evidence at all. In fact, the only evidence in the record regarding a disability is Mr. Glass's own admission that the only impact on his life as a result of depression during that time frame was that he couldn't work more than 50 hours in a week or, I'm sorry, 50 hours in a week or five days a week. As a matter of law, someone who works full-time is not disabled. And the Court's absolutely correct. He presented no evidence from Dr. Link or anyone else. If he really wanted to establish a disability, he could have taken some discovery in this case. Appellant's counsel didn't take a single deposition, not from Dr. Link, not from Ms. Nasta, not from anyone at Intel that might have provided evidence that he thinks would support his claims. Instead, he's relying simply on his own declaration, which, at least for purposes of performance problems, Mr. Glass's own perception that he was doing just fine is simply insufficient to establish a question of fact that would preclude summary judgment on that point. In fact, to the contrary, in response to Intel's motion for summary judgment, Mr. Glass concedes that when he returned from a two-and-a-half-week vacation at the end of 2005, he concedes that issues with his behavior and performance actually worsened. And that's in the excerpts of record on page 195. Are you here to also to defend the sanctions imposed against counsel on this claim? Just a few points on that, Judge Reinhart. First of all, you asked the question, was your submission in response to Intel's motion for attorneys' fees submitted late, and the answer to that is no. But the district court expressly corrected any procedural prematurity with that issue by granting Mr. Ducroix's motion for reconsideration on that basis, subsequently permitting both Mr. Ducroix and Mr. Glass to submit subsequent briefing on the issue, considering that briefing, and then after doing so, concluding that nothing had been changed in the motion, that not only should attorneys' fees be assessed in the minimal amount that they were, i.e., $10,000 out of a total of more than $100,000 incurred by Intel, but also, frankly, came up with an approach that is, in hindsight, more fair than the approach Intel had proposed, and that is to apportion that sanction equally, $5,000 each, against Mr. Glass and against his counsel. So do I go ahead? You are going. Go ahead. Kennedy, I'm just curious, why do you say that's more fair? More fair to whom? It doesn't affect Intel. You get your $10,000 if that's upheld, but instead of having it against counsel, it's against half against counsel, half against Mr. Glass. That's correct. I'm just curious as to why you think that's more fair. More fair to whom? Well, I'm not here to advocate on behalf of Mr. Glass, but I guess more fair to him from the district court's perspective. More fair to Mr. Glass to have to pay $5,000 than to pay nothing? As opposed to $10,000, which is what Intel. I thought, I see. It's shifting half to his counsel, he says, more fair to Mr. Glass. Correct. Intel and then it's. How about to his counsel? It's not so good for him. I'll leave that to him to explain how to. It does sort of seem like that's sort of the real reason we're here is to address that fees issue. And it does seem that even the sanctions against counsel seems to be driving the boat perhaps a little bit more than the sanctions against Mr. Glass. Let me ask you the same question I asked him. Is my analysis of this issue, is it de novo or discretion? Abusive discretion, Your Honor. Why do you say that? I believe that's – I can't cite the case to you and I apologize, but under both section 1927, which was the basis for sanctions against counsel, and assessment of it. Certainly, under 1927, it's an abusive discretion for counsel, correct? That's correct. And I believe the same is also the case for the assessment of attorney's fees against a – well, in favor of a prevailing defendant under Title VII in the Americans with Disabilities Act, obviously applying the Supreme Court's guidance in the Christenberg garment case, which said an award of fees should be rare, but in certain circumstances, they are appropriate. And the district court went through that analysis as to why a limited amount, in this case $5,000 or $10,000, accomplished both objectives. I mean, she – this district court judge was uniquely qualified to assess this situation. She presided over all three of Mr. Glass's lawsuits against Entel. She was – she was aware of what had occurred. She wasn't required to purge all of those events from her memory. And even so, in this case alone, there was certainly enough basis for the district court to reach the conclusion it did. Just a couple of examples. One, the harassment claims. The appellant continued to press claims of disability and age harassment without ever identifying a single comment relating to either. The appellant also continued to press this disability claim when, in the second of his two lawsuits, which the district court granted summary judgment on. I ask you, are there any more suits pending, or is this the last? I'm not aware of any others at this point, Your Honor, and hopefully this is the last. It occurs to me that it's possible that both sides would be – have some interest in the settlement of the case before we decide it, in that I would assume your opponents would not be very happy about having to pay $10,000, that you really don't need the $10,000 much. You might be just as happy to get rid of the case finally. Now, I'm not suggesting that either side would like to agree to that, but it does seem to me it's worth exploring with mediation whether that might not be a settlement that would leave both sides not unhappy, at least. Now, if anybody thinks there's no point in going to mediation for a discussion of that possible resolution, then we'll go ahead and decide the case, and you both have something to risk. $10,000 may mean more to your opponents than to your clients. But is there any reason you shouldn't try to talk in mediation at this point? No. And I'll certainly confer with my client about it and see if that's something that they'd like to do. Your point is well taken, Your Honor. Our primary interest here today is in discussing the fact that the district court was correct in dismissing all of Mr. Glass's claims by way of summary judgment. My client's interest is obviously having an end to the litigation at long last. All right. Thank you, counsel. Thank you, Your Honor. Now, counsel, I'm going to say, if you talk to your client about mediation, I mean, I'm sure you would have to before you agree. But I think you can see what the problems are with continuing with the case, and we'll have to discuss it among ourselves if we have to. But the alternative of not only when you file a lawsuit, you like to come out with something, not with less than what you went in. And I can tell you a story about how somebody close to me once had a small claim suit and ended up paying $25,000 instead of recovering. So it's something I would seriously discuss with my client at this point. And we'll give you 10 days to let us know whether you would be willing to participate in mediation. And if not, we will issue a decision. To whom do we respond? Just write to the court and the clerk of the court, and you can just send a letter in to the clerk and say we are willing to participate in mediation, or we are not willing to participate in mediation. And the clerk will get it to us, and we'll have a decision. If I could just also answer one of your questions, there are no other lawsuits. Thank you. Yes. Thanks very much, both of you. The case, it is argued, will be submitted. And there may be, just for your edification, if $10,000 is the amount, it may not be that you need mediation, you may just be able to settle this. Point well taken. Yes. If you don't have a lot of luck with your client, it may be that if the mediator suggests that you get further. But if you all can resolve it without us, Judge Smith is quite right. We're not looking for any more business. Thank you. Thank you.
judges: Reinhardt, O'scannlain, Smith N. R.